## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Jason Procknow,

              Plaintiff,

v.

Hugh Curry, *et al.*,

              Defendants.

Civ. No. 12-971 (RHK/SER)
**MEMORANDUM OPINION
AND ORDER**

---

Amanda R. Cefalu, Anderson, Helgen, Davis & Nissen, P.A., Minneapolis, Minnesota, for Plaintiff.

Ryan M. Zipf, League of Minnesota Cities, St. Paul, Minnesota, for Defendants Hugh Curry, Brian Rundquist, Matt Ondrey, Brian Renzy, Rich Evans, and John Collins.

---

## INTRODUCTION

This action arises out of Plaintiff Jason Procknow's arrest at the Extended Stay America Hotel (the "Hotel") in Eagan, Minnesota, on August 29, 2011. Procknow alleges the arresting officers used excessive force while taking him into custody, in violation of the Fourth Amendment to the United States Constitution, and that several *other* officers violated the Fourth Amendment by conspiring to search, without a warrant, the room in which he was staying.[1] He also asserts claims for assault and discrimination.

---

[1] Six Eagan police officers are named as Defendants: Hugh Curry, Brian Rundquist, Matt Ondrey, Brian Renzy, Rich Evans, and John Collins. Procknow originally asserted his excessive-force and unlawful-search claims against all six officers, but currently he asserts the force claim against Curry, Ondrey, and Rundquist and the search claim against Evans, Collins, and Renzy. (See Doc. No. 89.) Several other claims asserted by Procknow in the Complaint

Presently before the Court is Defendants' Motion for Summary Judgment (Doc. No. 23).

For the reasons that follow, the Motion will be granted in part and denied in part.

## BACKGROUND

Viewed in the light most favorable to Procknow, the record reveals the following

facts.[2]   Procknow was convicted of (among other things) attempted first-degree murder in

Wisconsin in 1992.  He was paroled in 2001 but his parole was revoked a year later when

he was convicted of forgery, identity theft, and related crimes, as well as fleeing/eluding

a police officer.  After a further period of incarceration, he was again paroled in January

2010, but he absconded from supervision in early 2011 and the Wisconsin Department of

Corrections issued a warrant for his arrest.

On August 26, 2011, Procknow booked a room at the Hotel through the website

priceline.com, paying for it in advance with his credit card.  The reservation was for two

people but was made in the name of Procknow's girlfriend, Jennifer Van Krevelen; the

two intended to stay at the Hotel from August 28 through August 31.  When they arrived

at the Hotel on August 28, Van Krevelen filled out a registration form indicating the

"guest name" was "Jen Van Krevelen," the dates of the stay were from August 28 to

August 31, the number of adults was 2, and the car associated with the room was a 2009

Pontiac with Minnesota plates (Van Krevelen's car).  The form contained blanks for

---

have now been resolved.  (See id.)  Accordingly, the term "Defendants" refers here only to the
six Eagan officers.

[2] Many of these facts are recited in the Report and Recommendation of United States Magistrate
Judge Stephen L. Crocker in Procknow's related criminal case.  See United States v. Procknow,
Crim. No. 13-53, Doc. No. 67 (W.D. Wis. Nov. 5, 2013), adopted, Doc. No. 93 (W.D. Wis. Dec.
20, 2013).

"signature of primary guest" and "signature of secondary guest," the first of which was signed by Van Krevelen and the second of which was left blank.  In other words, nothing on the form indicated that Procknow would be staying in the room, despite a Hotel policy mandating that all occupants be "registered"; this was intentional, as Procknow was attempting to "lay low" from law enforcement.  The two were assigned room 315.

Wisconsin authorities learned of Procknow's whereabouts and contacted Eagan police.  They advised Procknow had a prior criminal history, including an attempted murder conviction; would likely flee if confronted; and drove a 2004 black BMW with Wisconsin license plates.  A group of Eagan officers, including Defendants Rich Evans, John Collins, Matt Ondrey, and Brian Rundquist, traveled to the Hotel and asked the desk clerk if Procknow was staying there.  The clerk found no record of Procknow in the Hotel's computer, as his name had been omitted from the registration form.  The officers next asked about Van Krevelen and were informed she was staying in room 315; they went to the room and knocked on the door but received no response.  As the officers had not seen Procknow's car in the Hotel's parking lot, they concluded he and Van Krevelen were not there and headed to their squad cars to leave.

As the officers were driving off the property, Evans observed a black BMW with Wisconsin plates entering the Hotel's parking lot, and he radioed the other officers that he believed Procknow had just returned.  Collins and Rundquist came back to the Hotel and found Van Krevelen standing alone near the BMW.  They spoke with her while Ondrey approached the Hotel to attempt to locate Procknow, who had gone inside.  As Ondrey reached the Hotel's double entrance doors, he observed Procknow in the

vestibule, having just passed through the inner door from the inside.  Ondrey held open the outer door and said "you can come through, I'm heading in," before he recognized Procknow.[3]  Procknow then wheeled and started running through the Hotel lobby, with Ondrey giving chase and ordering him to stop.[4]  Ondrey could not see Procknow's hands as he fled, and he believed Procknow was reaching toward his waistband.  As Procknow reached an interior door, Ondrey fired his Taser,[5] with the probes lodging in Procknow's left shoulder and back.  Procknow lost bodily control and fell forward, his momentum carrying him "extremely hard" into the door.  He crumpled to the floor on his right side, his right arm caught between himself and the door.

Ondrey then moved closer and ordered Procknow to place his hands behind his back.  In response, Procknow rolled onto his stomach, ostensibly in an attempt to pull his arm out from against the door to comply with Ondrey's commands.  Ondrey, however, interpreted Procknow's actions as an attempt to stand and flee, and he discharged his Taser a second time.  Following this second discharge, Procknow managed to roll onto his stomach completely, and Ondrey again ordered him to place his hands behind his

---

[3] The officers were provided Procknow's photo by the Wisconsin Department of Corrections.

[4] According to Procknow, he turned and started to walk away before hearing a loud bang behind him, caused by Ondrey dropping his flashlight.  Procknow claims he was scared by the noise and began running.  Regardless, it is undisputed Procknow ran from Ondrey in the Hotel lobby and ignored commands to stop.

[5] A "Taser" is an "electronic control device that discharges two probes on a target when its trigger is pulled." United States v. Drapeau, 644 F.3d 646, 650 n.2 (8th Cir. 2011).  The probes are connected to the Taser by wires and penetrate the target's skin up to ½ inch deep, delivering an electric shock lasting up to five seconds and causing "electrical muscular disruption." McKenney v. Harrison, 635 F.3d 354, 362 (8th Cir. 2011).

back.  According to Procknow, as he attempted to do so, and while he was otherwise not
resisting, Ondrey Tasered him a third and final time.

At this point, Curry and Rundquist arrived to assist.  Procknow claims that as he
was lying on the floor, Curry approached and stomped on the back of his head without
warning, splitting open his forehead and "busting" open his eye.  Procknow also claims
that Curry then exclaimed, "Welcome to Minnesota Vikings territory,"[6] and "dropped"
his knee onto the back of Procknow's head "full force," breaking some of his teeth and
tearing the skin on his nose.  And, Procknow claims that Rundquist jumped onto his legs
and he (Rundquist) and Ondrey began hitting and punching him all over his body, while
Curry delivered a third blow to his head.  Procknow eventually lost consciousness from
the alleged beating and when he came to, he was leaning against the door with his hands
cuffed behind his back, bruised and bleeding profusely.

Procknow sat in the Hotel lobby for the next 10 to 15 minutes, with the officers
repeatedly asking him for permission to enter room 315; he refused.  Rundquist then
disappeared from the scene but returned approximately 10 minutes later holding a Hotel
room key (obtained from Van Krevelen)[7] and began whispering to the other officers.  A
short time later, Rundquist, Collins, and Defendant Brian Renzy went to room 315,
knocked, and after receiving no response, opened the door using Van Krevelen's key.
Inside, in plain view, they found several items they believed were evidence of fraud or
identity theft, including credit cards and W-2 forms in the names of other persons.  After

---

[6] Procknow was wearing a Green Bay Packers shirt.

[7] Officers had arrested Van Krevelen for harboring a fugitive and seized the key at that time.

photographing the scene, the officers secured the room, left, and obtained a search

warrant; a later search uncovered additional incriminating evidence.

In April 2012, Procknow commenced this action alleging *inter alia* that

Defendants (1) used excessive force while effecting his arrest, in violation of the Fourth

Amendment, (2) conspired to unlawfully search room 315, in violation of the Fourth

Amendment, and (3) conspired to discriminate against him and did discriminate against

him, in violation of 42 U.S.C. § 1985 and the Minnesota Human Rights Act (MHRA),

Minn. Stat. § 363A.01 *et seq.*, respectively.  While this matter was pending, Procknow

was indicted in the United States District Court for the Western District of Wisconsin on

27 counts of tax fraud and identity theft.  The indictment was predicated, in part, on

evidence found by the Eagan officers in room 315 on August 29, 2011.

On September 13, 2013, Procknow moved in his criminal case to suppress all the

evidence found in room 315 as "fruits of [an] illegal search."  He expressly argued that

the officers' warrantless entry into the room violated the Fourth Amendment.

Meanwhile, in *this* case, on August 16, 2013, Defendants moved for summary judgment

on all of Procknow's claims, arguing among other things that the search of room 315 did

not violate the Fourth Amendment.  To avoid entangling itself with the criminal

proceedings – specifically, the suppression motion that rested upon the same predicate as

the unlawful-search claim in this case – the Court continued the summary-judgment

Motion until after the suppression motion was decided.

On November 5, 2013, United States Magistrate Judge Stephen L. Crocker issued

a Report and Recommendation (R&R) in the criminal case recommending that the

suppression motion be denied.  After an evidentiary hearing at which numerous witnesses testified, Judge Crocker determined that Procknow "was not a legitimate guest at the hotel because he intentionally avoided making known his presence" and thus had no reasonable expectation of privacy in room 315.  Shortly after Judge Crocker issued the R&R, Procknow agreed to plead guilty to two of the charges in the indictment (with the Government dismissing the rest), but he reserved the right to challenge on appeal the denial of his suppression motion if the R&R were later adopted by the presiding district judge.  That came to pass on December 20, 2013, when United States District Judge William Connolly adopted the R&R, specifically agreeing with Judge Crocker that Procknow enjoyed no expectation of privacy in room 315, and even if he had, it terminated upon his arrest.  Procknow was later sentenced to 72 months' imprisonment on the two counts to which he pleaded guilty.  On February 21, 2014, he appealed his conviction and sentence, as well as the order denying his suppression motion, and that appeal remains pending before the Seventh Circuit.

With the criminal case now resolved, this case has awakened from its dormancy. At the Court's behest, the parties submitted supplemental briefs addressing whether Procknow's unlawful-search claim is precluded by collateral estoppel as a result of the criminal proceedings.  That issue, and the remaining issues raised in the summary judgment Motion, have now been fully briefed, and the Motion is ripe for disposition.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557

U.S. 557, 586 (2009).  The moving party bears the burden of showing that the material

facts in the case are undisputed.  Torgerson v. City of Rochester, 643 F.3d 1031, 1042

(8th Cir. 2011) (en banc); Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir.

2009).  The Court must view the evidence, and the inferences that may be reasonably

drawn from it, in the light most favorable to the nonmoving party.  Beard v. Banks, 548

U.S. 521, 529-30 (2006); Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th

Cir. 2009).  The nonmoving party may not rest on mere allegations or denials, but must

show through the presentation of admissible evidence that specific facts exist creating a

genuine issue of material fact for trial.  Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom

Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS

### I.      The discrimination claims

The Court begins its analysis with Procknow's discrimination claims, which are

easily dispatched.  Procknow alleges Defendants (i) "conspir[ed] to discriminate" against

him, in violation of 42 U.S.C. § 1985(3), and (ii) did in fact discriminate against him, in

violation of the MHRA, although he does not explain the nature of the alleged

discrimination.  (See Doc. No. 89 at 2.)  Regardless, a claim under § 1985(3) requires a

plaintiff to show the defendants conspired "for the purpose of depriving [him] of equal

protection of the laws, or equal privileges and immunities under the laws," which

"requires that the plaintiff prove a *class-based* invidiously discriminatory animus."  Davis

v. Jefferson Hosp. Ass'n, 685 F.3d 675, 684-85 (8th Cir. 2012) (emphasis added)

(citations omitted).  There is no evidence of any race-based (or other class-based) animus here.  See id. (claim under §1985(3) failed as a matter of law where plaintiff "failed to show any racial animus on the part of the defendants").  Similarly, Procknow's claim under the MHRA fails because he has not shown he is a member of any protected class.  See Minn. Stat. § 363A.02, subd. 1(2)-(3) (unlawful to discriminate against individual in public accommodations or public services based on race, color, creed, religion, national origin, sex, marital status, sexual orientation, or disability); Olson v. CenturyLink, No. A12-0884, 2013 WL 400354, at *1-2 (Minn. Ct. App. Feb. 4, 2013) (public-service or public-accommodation discrimination claim requires proof that plaintiff "is a member of a protected class").  Moreover, Defendants argued in their brief that Procknow has no evidence to support these claims (see Doc. No. 37 at 30-31), and in response Procknow did not address that assertion, a tacit acknowledgement he lacks such evidence.  Accordingly, the discrimination claims will be dismissed.

## II.   The search claim

Procknow next contends that officers Evans, Collins, and Renzy conspired to violate his Fourth Amendment rights by searching room 315 without a warrant.[8]  Conspiracies to violate a plaintiff's civil rights are actionable under both 42 U.S.C. § 1983 and § 1985, but under either statute, a plaintiff must prove an underlying constitutional violation.  See, e.g., Novotny v. Tripp Cnty., S.D., 664 F.3d 1173, 1179-80 (8th Cir. 2011) (no § 1985 conspiracy claim where plaintiff "has not adequately shown

---

[8] It is unclear why Evans is named as a Defendant on this claim, because Procknow has pointed to no evidence indicating he was involved in the decision to enter room 315 or actually entered the room.

any underlying constitutional violations"); Cook v. Tadros, 312 F.3d 386, 388 (8th Cir.

2002) ("In the absence of a [constitutional] violation, there is no actionable conspiracy

claim" under § 1983.).  And Procknow cannot prove such a violation here, for he is

unable to show the search of room 315 transgressed the Fourth Amendment.

### A.    Collateral estoppel

The legality of room 315's search has been thoroughly and exhaustively litigated

in the Wisconsin criminal proceedings.  After an evidentiary hearing that included live

testimony from a number of witnesses, Magistrate Judge Crocker determined that

Procknow enjoyed no reasonable expectation of privacy in room 315, a predicate to a

Fourth Amendment violation based on an unlawful search.  See, e.g., United States v.

Marquez, 605 F.3d 604, 609 (8th Cir. 2010) ("To establish a Fourth Amendment

violation, a defendant must show that he had a reasonable expectation of privacy in the

area searched.").  That determination was later adopted by Judge Connolly and now

presents an insurmountable hurdle for Procknow's claim.

Under the doctrine of collateral estoppel, "[o]nce a court has decided an issue of

fact or law necessary to its judgment, that determination is conclusive in a subsequent

suit based on a different cause of action involving a party to the prior litigation."  United

States v. Mendoza, 464 U.S. 154, 158 (1984).  A proponent of collateral estoppel must

show (1) the party sought to be precluded was a party to (or in privity with a party to) a

prior action, (2) the issue sought to be precluded is the same as the issue involved in the

prior action, (3) the issue was actually litigated in the prior action, (4) the issue was

determined by a valid and final judgment, and (5) the determination in the prior action

was essential to the prior judgment.  See, e.g., Sells v. Porter (In re Porter), 539 F.3d 889,

894 (8th Cir. 2008).  There cannot be any serious dispute these elements are met here.[9]

The first two elements are easily satisfied, as Procknow was a party to the

Wisconsin criminal case and the legality of the search was resolved (against him) in that

matter.[10]  Procknow contends the third element is not met here because he "did not fully

litigate the Fourth Amendment violation" in Wisconsin.  He argues no civil claims were

pending in that case and hence the Wisconsin court "would not have had a jurisdictional

basis to award [him] compensatory damages."  (Doc. No. 93 at 6; Doc. No. 96 at 3.)  But

this argument conflates res judicata, or claim preclusion, with collateral estoppel, or issue

preclusion.  The question before the Court is whether the issue now being raised – the

legality of the search – was litigated and resolved in Wisconsin, and clearly it was.  It

makes no difference whether the claim encapsulating that issue is one of suppression (as

in the criminal case) or constitutional damages (as in this case); the issue is identical.

Procknow next argues elements four and five have not been satisfied because the

criminal case terminated by a guilty plea.  (Doc. No. 96 at 3.)  He contends the legality of

---

[9] That Procknow has appealed the denial of his suppression motion does not preclude the
application of collateral estoppel.  See, e.g., Dickinson v. Ewing (In re Ewing), 852 F.2d 1057,
1060 (8th Cir. 1988) (pendency of an appeal "does not suspend the operation of an otherwise
final judgment as . . . collateral estoppel").  Nor does the fact he expressly reserved the right to
challenge the suppression ruling alter the analysis.  See, e.g., Maxwell v. Coker, No. CA-90-
0408, 1990 U.S. Dist. LEXIS 17483, at *9 (S.D. Ala. Dec. 20, 1990).  Procknow argues the
Court should await the result of his appeal before addressing this claim (Doc. No. 93 at 9), but
the Court declines to put this already-delayed case on hold any longer, especially since it
concludes the search claim fails on the merits in any event.

[10] The Court notes that the same standard of proof prevailed at the suppression hearing as
controls this case:  preponderance of the evidence.  See, e.g., United States v. Matlock, 415 U.S.
164, 178 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose
no greater burden than proof by a preponderance of the evidence.").

the search was neither part of the judgment resulting from his plea nor essential to that judgment. The Court disagrees. Procknow pleaded guilty shortly after Judge Crocker recommended denying his suppression motion. The legality of the search was the only matter seriously contested in the criminal case, and an adverse determination on that issue led directly to the guilty plea – indeed, Procknow reserved that issue (and only that issue) for appeal. Under similar circumstances, courts have found that denial of a suppression motion was necessary to the judgment entered via a subsequent guilty plea. See Maxwell v. Coker, No. CA-90-0408, 1990 U.S. Dist. LEXIS 17483, at *6 (S.D. Ala. Dec. 20, 1990) ("[T]he adverse determination of plaintiffs' motions to suppress cannot be treated as immaterial or incidental to the judgments entered on plaintiffs' pleas of guilty," because as "a practical matter, and in a very real way, . . . absent such determinations plaintiffs would not have entered pleas of guilty [at all]. That is, the obvious causal relationship between the denial of the motions to suppress and the entry of guilty pleas renders the determinations on the motions sufficiently necessary to the judgments entered for collateral estoppel to be applied."); see also McDowell v. Del. State Police, No. Civ. A. 95-129-SLR, 1999 WL 151873, at *4 (D. Del. Mar. 15, 1999) (denial of motion to suppress essential to judgment entered after plaintiff pleaded guilty in criminal proceeding).[11]  Simply put, "where the [criminal] court found [a] proper search . . .

---

[11] Procknow cites Haring v. Prosise, 462 U.S. 306 (1983), to argue that "where a criminal proceeding ends in a guilty plea, the issues in a related Section 1983 claim could not have been 'necessarily' determined by the judgment." (Doc. No. 96 at 3.)  But Haring is distinguishable because "the legality of the search of Prosise's apartment was not actually litigated in the criminal proceeding. Indeed, no issue was 'actually litigated' in the [criminal] proceeding since Prosise declined to contest his guilt in any way." 462 U.S. at 316. Here, by contrast, Procknow

following a full evidentiary hearing, subsequent Section 1983 claims challenging the legality of the . . . search . . . are barred as to those issues actually litigated in the suppression hearing." <u>Wallace v. Roche</u>, 921 F. Supp. 946, 953 (E.D.N.Y. 1996).

Finally, Procknow argues that collateral estoppel cannot apply because, in his order denying suppression, Judge Connolly rested the outcome on two alternative determinations: Procknow enjoyed no expectation of privacy in room 315, but even if he did, it terminated when he was arrested and "ejected" from the Hotel. According to Procknow, when a ruling is based on two independent grounds, either of which is sufficient to support the result, "the judgment is not conclusive with respect to either issue." (Doc. No. 96 at 5 (citing <u>Restatement (Second) of Judgments</u> § 27, cmt. i).) But the Restatement approach has been called into doubt repeatedly, including by the Second, Third, Seventh, Ninth, and Eleventh Circuits, <u>see</u> <u>Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.</u>, 458 F.3d 244, 251-53 (3d Cir. 2006) (collecting cases), and has never been adopted by the Eighth Circuit.[12]  In this Court's view, it makes little sense to deny collateral-estoppel effect to *each* alternative holding supporting a prior judgment. Indeed, a contrary conclusion would lead to an absurd result:  preclusion would *not* apply

---

litigated and lost his challenge to the search before pleading guilty. <u>Haring</u>, therefore, does not dictate the outcome. <u>See, e.g.</u>, <u>Daubenmire v. City of Columbus</u>, 507 F.3d 383, 390 (6th Cir. 2007) (distinguishing <u>Haring</u> in § 1983 action where plaintiffs had litigated the legality of their arrests in prior criminal case); <u>Coney v. Smith</u>, 738 F.2d 1199, 1199-1200 (11th Cir. 1984) (*per curiam*) (concluding <u>Haring</u> "does not apply" where plaintiff "litigated the issue of illegality of [a] search prior to his plea of guilty").

[12] <u>Baker Electric Cooperative, Inc. v. Chaske</u>, 28 F.3d 1466, 1475-76 (8th Cir. 1994), followed the Restatement approach, but there the Eighth Circuit was applying North Dakota law and expressly noted that North Dakota had adopted the Restatement view.

when a judge addresses *all* dispositive issues but *would* apply when he addresses only *one* such issue.  As noted in <u>Jean Alexander</u>:

> Applying issue preclusion to independently sufficient alternative findings furthers the basic objectives of the [collateral estoppel] doctrine.  Collateral estoppel . . . has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation.  Denying preclusive effect to a finding that would support a court's judgment merely because the case was disposed of on other grounds as well would result in the inefficient use of private and public litigation resources.  Courts routinely decide cases on multiple grounds, each of which has been fully litigated and given careful consideration due to their potentially dispositive role in the case.  Because the interests that the necessity principle protects are not compromised under these circumstances, it would be curious to conclude that *none* of these findings were necessary to the judgment for purposes of collateral estoppel.

458 F.3d at 253 (emphasis in original) (internal quotation marks and citation omitted).

For all of these reasons, Procknow is collaterally estopped from challenging the legality of room 315's search, and hence his conspiracy claim fails.

### B.    The merits

Even if Procknow had not already litigated the search's legality in his criminal case, the Court would find the claim fails on the merits.

As noted above, to establish a Fourth Amendment violation based on an allegedly unlawful search, "a defendant must show that he had a reasonable expectation of privacy in the area searched." <u>Marquez</u>, 605 F.3d at 609.  This requires Procknow to show "both a subjective expectation of privacy *and* that the expectation is objectively reasonable; that is, one that society is willing to accept." <u>United States v. Mendoza</u>, 281 F.3d 712, 715 (8th Cir. 2002) (emphasis added).  He fails on the second part of this test.

The Supreme Court has recognized that a legitimate expectation of privacy

extends to hotel occupants.  See, e.g., Stoner v. California, 376 U.S. 483, 490 (1964).

But that is not the end of the story here, for Procknow was an *unregistered* Hotel guest

"laying low" from law enforcement.  True, he paid in advance for the room (in Van

Krevelen's name), spent several days there before his arrest, and at least some evidence

indicates certain Hotel staff members knew he was there.  But by failing to register,

Procknow violated both Hotel policy and Minnesota law.[13]  In the Court's view, society

would not be willing to recognize a legitimate expectation of privacy in these

circumstances.  See, e.g., United States v. Jacobsen, 466 U.S. 109, 123 n.22 (1984) ("A

burglar plying his trade in a summer cabin during the off season may have a thoroughly

justified subjective expectation of privacy, but it is not one which the law recognizes as

'legitimate.'"); United States v. Lozano, 623 F.3d 1055, 1064 (9th Cir. 2010)

(O'Scannlain, J., concurring) ("'wrongful' interests do not give rise to legitimate

expectations of privacy"); United States v. DiMaggio, 744 F. Supp. 43, 49 (N.D.N.Y.

1990) (when an individual withholds his true identity, "he has effectively repudiated any

connection or interest in the item [searched] vis-a-vis society").  This is especially true

here because Procknow was on (and had absconded from) parole; a parolee's Fourth

Amendment rights are more circumscribed than the average person's.  Samson v.

---

[13] It is undisputed the Hotel left a "Guest Information" brochure on the bed of every room
providing "[a]ny failure to . . . register all occupants . . . will result in the immediate termination
of your stay and your eviction from the room."  Similar language was found on the registration
form filled out by Van Krevelen.  Likewise, Minnesota law requires all persons seeking "guest
accommodations" at a hotel to provide "the name and home address of the guest and every
person, if any, with the guest as a member of the party."  Minn. Stat. § 327.10-.11.

California, 547 U.S. 843, 848-50 (2006) (parolees "do not enjoy the absolute liberty to which every citizen is entitled") (internal quotation marks and citations omitted).  As Judge Connolly concluded, "[s]ociety is no more likely than most courts to find reasonable a fugitive parolee's claimed expectation of privacy while hiding out in his girlfriend's hotel room."  (United States v. Procknow, Crim. No. 13-53, Doc. No. 93 at 11 (W.D. Wis. Dec. 20, 2013).)  This Court agrees.

Furthermore, even if society were prepared to recognize some expectation of privacy for Procknow in room 315, any such expectation would have terminated before the officers conducted the search.  While a hotel occupant enjoys some measure of Fourth Amendment protection in his room, "[j]ustifiable eviction terminates [the] occupant's reasonable expectation of privacy."  United States v. Molsbarger, 551 F.3d 809, 811 (8th Cir. 2009).  As noted above, Hotel policy provided that "[a]ny failure to . . . register all occupants . . . will result in the immediate termination of your stay and your eviction from the room."  Hence, any privacy expectation Procknow might have enjoyed was precluded by his failure to register and the concomitant "immediate termination of [his] stay."  See, e.g., United States v. Henderson, No. 05-00355-01-CR, 2006 WL 1520288, at *6 (W.D. Mo. May 25, 2006) (no expectation of privacy in hotel room following defendant's arrest, as hotel policy provided "occupants would be immediately evicted if they . . . were arrested on the premises").  Moreover, Hotel policy also provided that persons "engaged in illegal activities or disrupting . . . other guests . . . will be immediately removed from the premises."  Procknow was both engaged in illegal activities (violating parole) and caused a disruption by fleeing through the Hotel lobby.

Under these circumstances, no reasonable expectation of privacy existed when the officers entered room 315.

## III.   The excessive-force and assault claims

In his final claims, Procknow asserts that officers Curry, Ondrey, and Rundquist used excessive force when effecting his arrest, in violation of the Fourth Amendment and Minnesota law.  The officers argue they are entitled to qualified immunity on the constitutional claim[14] and official immunity on the state-law claim.  For the reasons set forth below, the officers are only partially correct.

### A.   The federal claim[15]

#### 1.   Qualified immunity standards

"Qualified immunity shields [a] government official[] from liability . . . unless the official's conduct violates a clearly established constitutional . . . right of which a reasonable person would have known."  LaCross v. City of Duluth, 713 F.3d 1155, 1157 (8th Cir. 2013).  Determining whether a police officer is entitled to immunity, therefore, requires the Court to answer two questions:  Do the facts alleged, when viewed in the light most favorable to the plaintiff, show the challenged conduct violated a constitutional right?  If so, was that right clearly established on the date in question?  Id.

---

[14] Curry has not moved for summary judgment on this basis.

[15] The Court notes the officers have been sued in both their official and individual capacities under 42 U.S.C. § 1983.  But official-capacity claims against government officials are the functional equivalent of claims against the municipal entity in question (here, the City of Eagan), see, e.g., Rogers v. City of Little Rock, Ark., 152 F.3d 790, 800 (8th Cir. 1998), and Procknow has dropped his claims against the City.  (See Doc. No. 89.)  Hence, he has no § 1983 claim against the officers in their official capacities.  The analysis that follows, therefore, concerns only Procknow's individual-capacity claims.

The constitutional right at issue here is the Fourth Amendment's prohibition on unreasonable seizures.  It is undisputed that on August 29, 2011, the date of Procknow's arrest, it was clearly established that police officers could not employ excessive force against an arrestee without running afoul of the Fourth Amendment.  See, e.g., Andrews v. Fuoss, 417 F.3d 813, 818 (8th Cir. 2005).  The question, then, is whether the evidence in the record creates a genuine issue that the officers' conduct violated that right.

Whether a police officer used constitutionally excessive force is analyzed under an "objective reasonableness" standard.  Graham v. Connor, 490 U.S. 386, 392 (1989); Samuelson v. City of New Ulm, 455 F.3d 871, 875 (8th Cir. 2006).  The Court must consider, among other things, "the severity of the crime at issue, whether the [plaintiff] pose[d] an immediate threat to the safety of the officers or others, and whether [the plaintiff] . . . resist[ed] arrest or attempt[ed] to evade arrest by flight."  Samuelson, 455 F.3d at 875 (internal quotation marks and citation omitted).  Put another way, determining the reasonableness of the force requires the Court to "evaluate the totality of the circumstances," "careful[ly] balancing of the nature and quality of the intrusion on [the arrestee's] Fourth Amendment interests against the countervailing governmental interests at stake."  Copeland v. Locke, 613 F.3d 875, 881 (8th Cir. 2010) (citations omitted).  This inquiry is an objective one, "without regard to [each officer's] underlying intent or motivation."  Samuelson, 455 F.3d at 875-76 (citation omitted).  Moreover, the use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and the Court must remain mindful that "officers are often forced to make split-second judgments – in circumstances that are

tense, uncertain, and rapidly evolving – about the amount of force . . . necessary."

Graham, 490 U.S. at 396-97 (citation omitted).  And, because liability under § 1983 "is

personal, . . . each defendant's conduct must be independently assessed."  Heartland

Acad. Cmty. Church v. Waddle, 595 F.3d 798, 805-06 (8th Cir. 2010).

### 2.    These standards applied to the challenged conduct here

Procknow first contends that the record creates a genuine issue whether Ondrey

employed excessive force through his use of the Taser.  The Court agrees in part.

Ondrey deployed the Taser for the first time after Procknow, a large man (6'1"

and 235 pounds), ran from him through the Hotel's lobby.  It is undisputed Ondrey was

aware of Procknow's prior criminal history, including his attempted murder and

fleeing/eluding convictions, and had been advised Procknow would attempt to flee if

confronted.  A hotel lobby is a dangerous place for a foot chase, as the likelihood of

encountering and injuring innocent bystanders is high; indeed, Ondrey heard a woman

scream during the pursuit.  Moreover, Procknow ignored Ondrey's commands to stop

running, and it is undisputed Ondrey believed he was reaching toward his waistband and

feared he was attempting to grab a weapon.  Given the "tense, uncertain, and rapidly

evolving" circumstances confronting him, the Court concludes Ondrey's first deployment

of the Taser was reasonable.  See, e.g., McKenney v. Harrison, 635 F.3d 354, 360 (8th

Cir. 2011) (proper to use Taser on misdemeanant who "made a sudden movement toward

[a] window, which the officers reasonably interpreted as an active attempt to evade arrest

by flight"); Neely v. Jefferson Cnty., Ark., No. 5:10-CV-40, 2011 WL 3565585, at *3

(E.D. Ark. Aug. 12, 2011) (appropriate to use Taser to subdue plaintiff "wanted on felony warrants and [who] was fleeing arrest").[16]

Ondrey deployed the Taser a second time after Procknow had fallen to the ground, pinning his right arm between himself and a door.  At that point, Ondrey approached and repeatedly ordered Procknow to produce his hands.  The concern that Procknow might have a weapon persisted,[17] and Ondrey remained alone, without assistance from other officers.  See Brown v. Golden Valley, 574 F.3d 491, 498 (8th Cir. 2009) (noting that one factor supporting the use of a Taser in Draper v. Reynolds, 369 F.3d 1270 (11th Cir. 2004), was that Reynolds "at the time was the only officer on the scene").  Procknow claims he attempted to comply with Ondrey's commands by rolling onto his stomach, in order to free his pinned right hand.  But nothing in the record indicates Procknow voluntarily offered his *left* hand, and in the Court's view, given his prior attempt to flee, it was not unreasonable for Ondrey to interpret Procknow rolling onto his stomach as an attempt to stand and run.  Accordingly, the Court concludes that Ondrey's second deployment of the Taser also was reasonable.  See, e.g., Carpenter v. Gage, 686 F.3d 644, 649-50 (8th Cir. 2012) (affirming dismissal of excessive-force claim where plaintiff was Tasered after failing to produce hands for cuffing, despite plaintiff's assertion he moved

---

[16] Procknow's attempt to analogize this case to Shekleton v. Eichenberger, 677 F.3d 361 (8th Cir. 2012), and Brown v. City of Golden Valley, 574 F.3d 491 (8th Cir. 2009), is unavailing.  In neither of those cases did the arrestee actively flee from a police officer in a location in which others were likely to be present.  Nor did the arrestees have prior convictions for attempted murder or other similarly serious crimes.

[17] Procknow contends he had nothing in his hands, but Ondrey observed Procknow for only a very short time before he started running, and nothing in the record indicates Ondrey knew – or should have known – Procknow was not *hiding* a weapon.

his hands "merely as an effort to breathe"); Wertish v. Krueger, 433 F.3d 1062, 1066-67 (8th Cir. 2006) (reasonable for officers to forcibly remove plaintiff from car after he failed to pull over for more than five miles, even though plaintiff was suffering from diabetic reaction that caused his conduct).  As in Carpenter, "[e]ven if [Procknow's] motive was innocent, [Ondrey] reasonably could have interpreted [his] actions as resistance and responded with an amount of force that was reasonable to effect the arrest."  686 F.3d at 650.

Ondrey's third and final use of the Taser is more problematic, however. According to Procknow, when Ondrey discharged the Taser for a third time, he (Procknow) had managed to roll onto his stomach, was no longer resisting, and was moving his arms behind his back in order to be handcuffed.  Nevertheless, Ondrey Tasered him again.  Though Procknow's initial flight and resistance justified the first two Taserings, the calculus changed when Procknow (allegedly) became compliant.[18]  If Procknow was indeed complying with Ondrey's commands and had surrendered himself for handcuffing, then Ondrey's use of a Taser would be unreasonable as a matter of law. See Coker v. Ark. State Police, 734 F.3d 838, 843 (8th Cir. 2013) (reversing grant of summary judgment to police officer based on plaintiff's testimony that he laid down on the ground and placed his hands behind his back, despite it being undisputed plaintiff had

---

[18] The Court says "allegedly" because, not surprisingly, the officers paint a very different picture of Procknow's conduct.  For purposes of summary judgment, however, the Court must assume his version of events as true.  See Scott v. Harris, 550 U.S. 372, 378 (2007) (Courts are required to view the facts and draw reasonable inferences "in the light most favorable to the party opposing the [summary judgment] motion.  In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts.").

led officer on high-speed chase exceeding 150 miles per hour and, after crashing, had run from the officer before giving himself up); Elex v. Glirbas, Civ. No. 12-3206, 2014 WL 2462811, at *6 (D. Minn. May 29, 2014) (Montgomery, J.) (denying qualified immunity to officer who, according to the plaintiff, kicked him after he had fled but then surrendered).

Finally, Procknow also contends that Ondrey and Rundquist used excessive force *after* the third Tasering. According to Procknow, by the time Rundquist had arrived to assist, he (Procknow) was already laying on the Hotel floor, not resisting. Nevertheless, Ondrey and Rundquist (allegedly) jumped on him and punched him all over his body. For the reasons discussed immediately above, the use of such force against a compliant, no-longer-fleeing suspect would be unreasonable as a matter of law, despite his earlier attempt to avoid arrest.

## B.     The assault claim

Ondrey, Rundquist, and Curry next seek summary judgment on Procknow's state-law claim for assault, arguing they are entitled to official immunity.[19] The Court disagrees.

At the outset, the Court notes that although Procknow labeled his alleged beating as an "assault" in the Complaint, a more apt label for his claim would be "battery." See Grady v. Becker, 907 F. Supp. 2d 975, 985 n.11 (D. Minn. 2012) (Kyle, J.) (explaining

---

[19] It is not entirely clear whether Curry seeks summary judgment on this claim. In their moving brief, Defendants argued Procknow "cannot produce any evidence that *any* Eagan police officer committed the tort of assault, and the Court should dismiss that claim against the Eagan police officers." (Doc. No. 37 at 26 (emphasis added).) But in their most recent status report (Doc. No. 89), Defendants assert that Curry "did not bring a motion for summary judgment" on this claim.

the difference between assault and battery in excessive-force case and noting "the facts

. . . more easily fit battery than assault").  The Court will analyze the claim accordingly.

See, e.g., Webb. v. Hiykel, 713 F.2d 405, 407-08 (8th Cir. 1983) ("It is well settled that

the 'theory of the pleadings' doctrine, under which a plaintiff must succeed on those

theories that are pleaded or not at all, has been effectively abolished under the Federal

Rules of Civil Procedure."); Tigue v. Swaim, 585 F.2d 909, 913 (8th Cir. 1978) (labels of

false imprisonment and libel were not controlling where facts alleged in complaint

supported constitutional due-process claim).[20]

Official immunity shields a public official from liability if he is "charged by law

with duties which call for the exercise of his judgment or discretion" and, in performing

those duties, he has not committed "a willful or malicious wrong."  Garcia v. Hennepin

Healthcare Sys., Inc., Civ. No. 11-1639, 2011 WL 4808200, at *1 (D. Minn. Oct. 11,

2011) (Kyle, J.) (quoting Anderson v. Anoka Hennepin Indep. Sch. Dist. 11, 678 N.W.2d

651, 655 (Minn. 2004)).[21]  "In the context of official immunity, 'willful' and 'malicious'

are synonymous," as malice means "'nothing more than the intentional doing of a

---

[20] It is especially appropriate for the Court to re-cast this claim as one for battery, given that Procknow was *pro se* when he filed the Complaint.  E.g., Whitson v. Stone Cnty. Jail, 602 F.3d 920, 922 n.1 (8th Cir. 2010) ("[A] pro se complaint must be liberally construed, and pro se litigants are held to a lesser pleading standard than other parties.") (internal quotation marks and citations omitted).

[21] Public officials generally are *not* entitled to official immunity in connection with ministerial acts, *i.e.*, acts involving "mere[] execution of a specific duty arising from fixed and designated facts."  Wiederholt v. City of Minneapolis, 581 N.W.2d 312, 315-16 (Minn. 1998) (citation omitted).  No party here contends Defendants were engaged in ministerial acts when effecting Procknow's arrest.  See McClennon v. Kipke, 821 F. Supp. 2d 1101, 1111 (D. Minn. 2011) (Kyle, J.) ("There can be no dispute that the amount of force used to effect an arrest is a discretionary decision.").

wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right.'" Brown, 574 F.3d at 500-01 (citation omitted).

If a jury were to credit Procknow's version of events here, it could reasonably conclude that Ondrey, Rundquist, and Curry willfully violated his clearly established right to be free from excessive force.  Accordingly, the officers are not entitled to official immunity on Procknow's assault (battery) claim.  See, e.g., Johnson v. Carroll, 658 F.3d 819, 829 (8th Cir. 2011) (reversing grant of summary judgment based on official immunity where there existed "a factual dispute regarding whether the officers used excessive force during the arrest"); Brown, 574 F.3d at 500-01 (same).

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 23) is **GRANTED IN PART** and **DENIED IN PART**.  The Motion is **GRANTED** with respect to Procknow's claims for (i) conspiracy to discriminate under 42 U.S.C. § 1985(3), (ii) discrimination under the MHRA, and (iii) conspiracy to violate the Fourth Amendment, which are **DISMISSED WITH PREJUDICE.**  The Motion is further **GRANTED** with respect to the excessive-force and assault claims, to the extent those claims challenge Ondrey's first and second uses of the Taser.  The Motion is **DENIED** with respect to the claim that Ondrey's third use of the Taser, and the subsequent conduct of Ondrey, Rundquist, and Curry, constituted excessive force and assault.

Date:  June 17, 2014                                  s/Richard H. Kyle
                                                      RICHARD H. KYLE
                                                      United States District Judge